## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------X

JOSE DE LOS SANTOS,

               Plaintiff,

                                      Docket No.

   v.

NATIONAL RAILROAD PASSENGER CORP.,

               Defendant

---------------------------------------------------------------X

### COMPLAINT

Plaintiff, by his attorneys, the Naumes Law Group, LLC, complain of the Defendant and allege:

### THE PARTIES

1.        Plaintiff, Jose De Los Santos, is a resident of Boston, Massachusetts.

2.        The defendant is a railroad carrier corporation providing railroad transportation, in interstate commerce by rail and operates a railroad system and railroad yards within the jurisdiction of this Court and in various other States, with a usual place of business in Massachusetts.

3.        Prior to June 23, 2017, and at all times hereinafter mentioned, the defendant employed the plaintiff, Jose De Los Santos, as a foreman under its direction, supervision and control and in furtherance of defendant's business in interstate commerce.

1

4.      Prior to June 23, 2017, and at all times hereinafter mentioned, the defendant maintained, operated and controlled the Amtrak's Southampton Yard in Boston, Massachusetts which contained defendant's tracks, rails, switches, sidings, roadbeds and appurtenances thereto, over, through and upon which the defendant operated engines, trains and cars under its control and direction.

5.      During all times herein mentioned, the defendant was and is engaged in interstate commerce by providing railroad transportation among multiple states.

**JURISDICTION AND VENUE**

6.      The plaintiff brings the First Cause of Action against the defendant for violations of the Federal Rail Safety Act, 49 U.S.C. § 20109 (FRSA).

7.      This Court has subject matter jurisdiction in this case pursuant to the Federal Railroad Safety Act, 49 U.S.C. § 20109(d)(3).

8.      Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District, because defendant resides in this District and/or because defendant does business in this District.

**PROCEDURAL FACTS**

9.      On December 8, 2017, the plaintiff Jose De Los Santos, filed a FRSA Complaint with the Secretary of Labor's Regional OSHA Whistleblower Office.  That was within 180 days from the date the plaintiff became aware of the defendant's adverse or unfavorable personnel action against him.

10.     The Regional OSHA Whistleblower Office commenced its investigation, and the plaintiffs fully cooperated with OSHA's investigation. However, Department of Labor did not issue a final decision within 210 days after the filing of the FRSA Complaint.  The delay was not due to any bad faith on the part of the plaintiff.

11.     Pursuant to Section (d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in a United States district court for a jury trial regarding the Railroad's violations of the FRSA. 49 U.S.C. § 20109(d)(3).

12.     Pursuant to 49 U.S.C. § 20109(d)(3), the plaintiff now brings this original action at law and equity for *de novo* review by the United States District Court of the District of Massachusetts, which Court has jurisdiction over this FRSA action without regard to the amount in controversy.

## FACTS

13.     At the time of the defendant's FRSA violations, the plaintiff was employed by the defendant and qualified as an employee within the meaning of 49 U.S.C. § 20109.

14.     On or about 2011, Amtrak hired Mr. Joseph C. Allione, Jr. as the assistant superintendent of Amtrak's mechanical department at Southampton Yard in Boston, Massachusetts.

15.     At all times relevant herein, Mr. Allione encouraged Amtrak employees to skirt safety inspections in favor of on time performance.

16.     At all times relevant herein, Mr. Allione stressed on time performance and told employees that identified defects or unsafe conditions that they were "looking to hard."

17.     On another occasion on which Mr. De Los Santos does not recall the exact date, the United States Department of Transportation Federal Railroad Authority ("FRA") identified as defective the coupler on Locomotive #675 or 695.

18.     A coupler is a mechanism for connecting the railroad cars in a train. If a coupler fails, the cars to a train will disconnect and could also derail, causing injury and potential death to passengers and crew and/or damage to the infrastructure.

19.     The FRA wrote up the incident, stating that the coupler had failed inspection. Mr. Santos gave the FRA report to Mr. De Los Santos and sent him to inspect the defective coupler on the locomotive.

20.     Mr. De Los Santos inspected it and noted that the latch on the coupler was not working properly, and he "shopped" the train and made note in the computer system that he had shopped it.

21.      "Shopping" a car on a locomotive means taking it off of the train and putting it on a separate track inside the repair shop.

22.     Mr. Allione discovered through the system that the train had been shopped and was angry because shopping the train meant that it would not be released on time.

23.     Through email and by word-of-mouth, Mr. De Los Santos learned that Mr. Allione had Mr. Santos "grease" the coupler instead of fixing it.

24.     The Code of Federal Regulations prohibits railroads from placing or continuing in service a car if the coupler is defective. *See* 49 C.F.R. 215.123.

25.     Greasing a coupler is an unauthorized and inappropriate repair under the FRA and Amtrak policy.

26.     After he greased the coupler, Mr. Santos put the locomotive back into service in violation of 49 C.F.R. 215.123.

27.     In January and February of 2017, Plaintiff sent reports of hazardous and unsafe working conditions to the National Aeronautics and Space Administration Confidential Close Call Reporting System ("C³RS").

28.     C³RS is a partnership between the National Aeronautics and Space Administration ("NASA") and the Federal Rail Administration ("FRA"), participating railroad carriers, and labor organizations. C³RS is designed to improve railroad safety by collecting and studying reports detailing unsafe conditions and events in the railroad industry. It enables employees to report unsafe working conditions or "close calls" voluntarily and confidentially.

29.     Under 49 C.F.R. § 218.23, railroad workers must display blue signals signifying that workers are on, under, or between rolling equipment.

30.     Blue flag protection within the railroad provides safety to workers by ensuring that the equipment they are working on or near is not moved.

31.     Under Amtrak's South Hampton Yard Operating Procedures for Blue Flag Protection, employees kept blue signal boards where employees were to hang magnets with their names while they performed work on a track. It states:

> When a move is made, the supervisor or designee will first check the
> designated blue signal boards on which employees were to ensure that all

employees have removed their name tags indicating they are clear of the equipment and track.

32.     On paper, Amtrak's blue signal policy looked like it worked. In practice, however, the policy was confusing because it was not always clear which foreman was responsible for which employees' tags. As a result, a practice developed among some foreman of dividing the flags in a way that created more confusion and the potential for unsafe conditions.

33.     This was particularly problematic for Mr. De Los Santos who was in charge of releasing trains because employees would leave for lunch with their blue flag's still affixed to the board.

34.     The problem was compounded by assistant superintendent Allione's insistence that all trains be released on time.

35.     This reality in Amtrak's Southampton Yard left Mr. De Los Santos the choice of being disciplined for removing another employee's blue tag or being subjected to Mr. Allione's wrath, or in this case both.

36.     On January 12, 2017, Amtrak employee Andrew Emmons put his blue tag on Train Number 67 and forgot to remove it after he had finished working on the train.

37.     On January 12, 2017, Plaintiff observed Mr. Emmons eating lunch in the lunchroom.

38.     On January 12, 2017, after seeing Mr. Emmons in the lunchroom, Plaintiff arrived at Train Number 67. After walking the length of train and determining that no employees were working on, under, or between rolling equipment, Plaintiff removed Mr. Emmons' blue tag and released the train.

6

39.     On January 12, 2017, Mr. De Los Santos reported this as an unsafe

working condition via the C³RS program involving a blue flag being left on the

board.

40.     On January 20, 2017, Mr. Allione retaliated against Mr. De Los
Santos by charging him with various company rule violations, stating:

**CHARGE ONE (1):** Alleged failure to comply with Amtrak's "Standards of Excellence",
specifically to the sub-section entitled concerning "Safety," which reads in part:

Amtrak's highest priority is the safety and well-being of our employees and customers. Your
help is essential to achieving that goal. You can begin by being sure that you understand and
comply with all safety requirements related to your position.....

**CHARGE TWO (2):** Alleged failure to comply with Southampton Yard's "Standard Operating
Procedure for Blue Signal Protection" SOP No.-BSB 3.6.4.01, Section 6 which reads in part:

"2. When a move is to be made, the supervisor or designee will first check the designated blue
signal boards to ensure all employees have removed their name tags indicating they are clear
of the equipment and track."

**CHARGE THREE (3):** Alleged failure to comply with Amtrak's "Guide to Safety Performance for
Mechanical Department Employees", Rule 1306 which reads in pertinent part:

"Mechanical Department employees engaged in the inspection, testing, repair and servicing of
rolling equipment whose duties require them to work on, under, or between such equipment
and subject them to the danger of personal injury posed by any movement of such equipment
must comply with the Code of Federal Regulations, (Blue Flag Protection) Title 49, part 218,
and all local policies."

**CHARGE FOUR (4):** Alleged failure to comply with Amtrak's "Standards of Excellence",
specifically to the sub-section entitled "Attending to Duties", which reads in part...

"Amtrak's success depends on using all available resources in the most efficient and productive
way possible. As an Amtrak employee and, therefore, the company's most important resource,
you have an obligation to perform your duties properly and in accordance with the standards
set for your particular job. This requires that you remain alert to your duties at all times. Any
activity or behavior that distracts or prevents you or others from attending to duties is
unacceptable."

**SPECIFICATION ONE (1):** On January 12, 2017, it is alleged that Train 67 was released from
Track 5 to the Yardmaster while a fellow Mechanical employee's "Blue Tag" was still on the
Blue Tag Board at the West End of the Service and Inspection Track. You were on duty and
assigned to Train 67, Track 5 of the S&I, and reportedly released the train to the Yardmaster.
According to Mr. Kiley's statement and that of your own statement (email), you were aware that
the employee's Blue Tag was on the board when you released Train 67. Based on video

verification, you were observed exiting the West End of the S&I between tracks 4 & 5 and did not observe that, nor inquire as to why the employee's Blue Tag was still on the board.

41.     On February 2, 2017, Mr. De Los Santos reported, via the C³RS program, another instance if an employee leaving a blue tag on the board.

42.     On February 3, 2017, Mr. De Los Santos reported, via the C³RS program, that a fire alarm test was performed without notice. This represented an unsafe working condition for everyone working at the facility.

43.     On February 24, 2017, Mr. De Los Santos, via the C³RS program, reported, another blue flag issue relating to an incident where there were no blue flags on the de-rails on the east end of the track in Amtrak's Southampton Yard. This created an extremely unsafe working condition.

44.     In addition to his C³RS report, Mr. De Los Santos verbally told Chris Purcell that "nothing is being done to protect me other than NASA. Amtrak is not protecting me at all."

45.     On February 24, 2017, Plaintiff observed that Train Number 173 in Amtrak's Southampton Yard was in a state of disrepair and flagged it for inspection. Plaintiff's general foreman, Rick Santos, commanded Plaintiff to release the train without inspection. Plaintiff refused and  was charged with insubordination.

46.     On February 28, 2017 Amtrak retaliated against Mr. De Los Santos by charging him with various company rule violations, stating:

**CHARGE ONE:**
Alleged failure to comply with Amtrak's "Standards of Excellence" specifically to the sub-section entitled concerning "Safety" which reads in part:

Amtrak's highest priority is the safety and well being of our employees and customers. Your help is essential to achieving that goal. You can being by being sure that you Understand and comply with all safety requirements related to your position...

**CHARGE TWO:**
Alleged failure to comply with Southampton Yard's "Standard Operating Procedure For Blue Signal Protection" SOP No. BSB 3.6.4.01. Section 6 which reads in part:

1. The supervisor or their designee will establish blue signal protection for the track on which work is to begin. This will include:
A blue flag (with blue light at night} and a derail (derail to be locked in the derailing Position} at least 50 feet from each end of the rolling equipment.

**CHARGE THREE:**
Alleged failure to comply with Amtrak's Guide to Safety Performance for Mechanical Department Employees Rule 1306 which reads in pertinent part:

Mechanical Department employees engaged in inspection, testing, repair and servicing of rolling equipment whose duties require them to work on, under or between such equipment and subject them to the danger of personal injury posed by movement of such equipment must comply with the Code of Federal Regulations (Blue Flag Protection) Title 49, part 218 and all local policies.

**CHARGE FOUR:**
Alleged failure to comply with Amtrak's "Standards of Excellence" specifically to the sub-section entitled to "Attending to Duties" which reads in part...

Amtrak's success depends on using all available resources in the most efficient and productive way possible. As an Amtrak employee and therefore the company's most important resource, you have an obligation to perform your duties properly and in accordance with the standards set for your particular job. This requires that you remain alert to your duties at all times. Any activity or behavior that distracts or prevents you or others from attending to duties is unacceptable.

**CHARGE FIVE:**
Alleged violation of Amtrak's Standards of Excellence section pertaining to Professional and Personal Conduct, which reads in pertinent part:

Teamwork- Being polite to each other is one of the basics of teamwork, so it is Important that we all are considerate and respectful of each other. Part of teamwork is properly performing your duties.  Another part is following instructions.  Therefore, you must comply with all company and departmental policies, procedures and rules as well as instructions, directions and orders from supervisors and managers.

The only exception to the above requirement arises when compliance with a particular

Instruction would cause a clear, immediate danger to you, our fellow employees, our Customers, the public or company property.

**CHARGE SIX:**
Alleged violation of Amtrak's Standards of Excellence section pertaining to Professional And Personal Conduct, which reads in pertinent part:

Conduct - On the Amtrak team, there is no place for activities or behaviors that compromise the safety, satisfaction  and well-being of our customers, the public or our fellow employees. Therefore, boisterous conduct such as fighting, rudeness, assault, intimidation, horseplay, and using profane or vulgar language is unacceptable. It is important to remain calm and be courteous to all customers, even those who may be difficult at times.

**CHARGE SEVEN:**
Alleged violation of Amtrak's Standards of Excellence section pertaining to Discrimination which reads in pertinent part:

Amtrak will continue to be a leader in providing equal opportunity for employees In a work environment free of discrimination and harassment.  As a matter of policy,

We manage this company and administer our programs without regard to race, Color, religion, sex, national origin, age, disability, sexual orientation or veteran's Status and in conformance with all applicable federal, state and local laws.
Therefore, we will not tolerate discrimination or harassment of any kind by our employees toward our customers, co-workers, including but not limited to racial, Ethnic, religious, or sexual slurs, whether written or spoken.

47.     On June 13, 2017 Amtrak held a formal hearing regarding the

charges against Mr. De Los Santos.

48.     On June 22, Mr. De Los Santos was informed by Amtrak that there

was substantial evidence that he violated company rules.

49.     On June 23, 2018, Amtrak notified Mr. De Los Santos that he had

been dismissed from Amtrak in all capacities effective immediately.

## COUNT I
### Violation of FRSA

50.     The plaintiff, Jose De Los Santos, adopts by reference and realleges each and every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if set forth under this cause of action.

51.     The plaintiff, Jose De Los Santos, engaged in protected activity under the FRSA when he reported an unsafe working condition via the C$^3$RS system in January and February of 2017.

52.     The plaintiff, Jose De Los Santos, engaged in protected activity under the FRSA when he reported an unsafe working condition related to the condition of Train Number 173 in Amtrak's Southampton Yard to General Forman Richard Santos.

53.     The defendant had knowledge of all the protected activities referenced above.

54.     The defendant took adverse or unfavorable actions against the plaintiff, Jose De Los Santos, in whole or in part due to plaintiff's protected activities.

55.     The adverse actions included bringing charges against plaintiff and terminating him.

56.     In so doing, the defendant acted with reckless disregard for the law and with complete indifference to the plaintiff's rights under the FRSA.

WHEREFORE, in order to encourage employees to freely report all injuries and safety concerns without fear of any retaliation, thereby ensuring the Federal Rail Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area of our

nation's railroad operations, the plaintiff demands a Judgment under the FRSA for all relief necessary to make him whole, including but not limited to: expungement of all references to any disciplinary action; lost benefits with interest; lost wages with interest; compensatory damages for economic losses due to defendant's conduct; compensatory damages for mental anguish and emotional distress due to defendant's conduct; the statutory maximum of punitive damages; and special damages for all litigation costs including expert witness fees and attorney fees.

WHEREFORE, plaintiff Jose De Los Santos demands judgment against the defendant on Count I in the sum of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS together with the costs and disbursements of this action.

## JURY TRIAL REQUESTED

Jose De Los Santos
By his attorneys,

DATE: JUNE 10, 2020

/s/ Christopher C. Naumes
Robert T. Naumes, BBO #:367660
Christopher C. Naumes, BBO #: 671701
NAUMES LAW GROUP, LLC
2 Granite Avenue, Suite 425
Milton, MA 02186
(617) 227 8444
Fed Bar No.: 09545
robert@Naumeslaw.com
christopher@naumeslaw.com
Attorneys for Plaintiff